(Cuyahoga County Common Pleas.)

FRANK DeHASS ROBISON v. THE CLEVELAND CITY RAILWAY COMPANY et al.

The shareholders of a corporation are entitled to relief in equity against an actual or threatened waste or misapplication of its corporate funds, and may bring a suit for that purpose in the name of the corporation, unless it appears that the directors refuse to prosecute, or are themselves the guilty parties answerable for the wrong. If they do thus refuse, or are thus answerable, the shareholders may sue in their own names; but in such a case, the corporation must be made a defendant, either solely or jointly, with the directors sought to be charged.

Spurious certificates of stock of a corporation, issued by the officer having apparent authority to do so, undistinguishable upon their face from the certificates of genuine stock, and outstanding in the hands of numerous holders as evidences of interests in the property of the corporation, are clouds upon the title of the genuine stockholders which a court of equity will remove. The directors of the corporation may institute a suit for this purpose, not as trustees of the property and funds under their control,

asking advice and aid for their own benefit, but as the representatives of the genuine stockholders and in their behalf, and if they refuse to bring such suit, a stockholder may bring it, making the corporation a co-defendant.

Sec. 5651, R. S., et seq., provide a specific manner or mode by which corporations may be dissolved; and this is exclusive, and the court, in the exercise of its general control and power over corporations, has no jurisdiction to order a dissolution of the corporation at the suit of any less number than that contemplated by the sections named, or in any other manner different from that contemplated by the statute.

A provisional receivership is, in effect, an injunction, and is to be granted with great caution, and only in a case of pressing apparent necessity. The appointment of a receiver is an equitable remedy, and bears a similar relation to courts of equity that proceedings in attachments bear to courts of law.

---

NEFF, J.:

In the case of Frank DeHass Robison against The Cleveland City Railway Company and others, the questions submitted and to be decided arise upon two motions and a demurrer; first, a motion of the plaintiff, in which he prays, first, for an order of reference; and second, for the appointment of a receiver or receivers. Secondly, a motion of the defendant company, The Cleveland City Railway Company, for a dissolution of the injunction or temporary restraining order, which operates to prevent payment of dividends and the further issuance of certificates of stock. Thirdly, upon a demurrer of John J. Shipherd to the petition of the plaintiff.

The petition of plaintiff is very voluminous indeed, occupying about thirty pages or more, embracing a vast and multifarious detail of items, and I am of the opinion that to read it or to state all contained in it, would conduce neither to clearness of statement nor correctness of conclusion, and I shall refer to it only in so far as it is necessary to understand or to make clear the questions presented upon this interlocutory hearing.

To this petition an answer was filed by the company, but I deem it unnecessary at this time to go into even the substance of that answer.

First, then, addressing our attention to the motion for an order of reference, and the appointment of a receiver or receivers, of the company. But, perhaps, preliminary to the consideration of this motion, it is necessary to determine whether the action as begun by the plaintiff can be maintained in his name. It is true no demurrer has been submitted or filed by the defendant, but they have answered, the principal defendant, the Railway Company; yet certainly, if the action as brought can not be maintained,

if upon the averments of the petition no affirmative relief can be granted, then it would be a work of superogation perhaps, or certainly unnecessary, to determine these interlocutory questions; or, at all events, it will be unnecessary to appoint a receiver or to order a reference, if the final relief prayed for can not under the averments of the petition be granted, even though a demurrer be not interposed to the petition.

As presenting this question, I desire to call attention to paragraphs 33 and 34, of the petition. After reciting the fact of consolidation, the circumstances attending the consolidation, the irregularities in the over-issue of stock, etc., the petition avers:

"33. That by reason of said facts, there is hopeless and almost inextricable confusion in the title to and possession of the capital stock of said defendant company; plaintiff and many other persons who own and are entitled to such stock or certificates therefor, are unable to get them—and many persons who are not entitled to such stock or certificates therefor, hold them under color of right and claim of title which can only be divested, if ever, or established after protracted and many litigations. That this chaotic condition, so wrongfully brought about and suffered by said corporation's neglect and the wrongful acts and negligence of its said officers and appointee, said defendants, M. A. Hanna, J. B. Hanna and John J. Shipherd, has injured and damaged and is injuring and damaging the property, rights and interest of said corporation, of this plaintiff, and of each other individual rightful owner of stock therein, irreparably, and depreciating the stock in value beyond remedy, and for such injuries, damage and depreciation there is, and can be for plaintiff and said other stockholders, no adequate remedy at law—without the equitable intervention of this court.

"34. That plaintiff did not discover or have any knowledge of the wrongs and injurious conduct of the affairs of defendant company and its officers and said Shipherd, and of the company's actual condition herein-above set out, till during the autumn of 1896. That when the knowledge began to come to him, he immediately applied to the president, said M. A. Hanna, to initiate steps to relieve the situation as to plaintiff, and to call a meeting of the Board of Directors for that purpose.

"That said Hanna utterly neglected and refused such relief, declaring that he had called the Board together, and they had left the entire matter in his hands for adjustment, and declaring it to be the defendant company's and his own intention to 'stand pat,' as he expressed it. Plaintiff then asked him as representing said Board, to meet plaintiff and other stockholders of the former Cable Company to adjust the situation, and he did so, and at said meeting refused all action looking to relief or remedy, stating that each man's case must be made separately and settled on its own merits—and said the company would never pay anything till a court should order it to,—that perhaps a friendly suit might be brought to determine the rights in question. The plaintiff applied to the attorneys of the company, who had formerly been his own attorneys, and they declined to interfere or attempt any relief of the situation, saying they saw no way of relief but for each person supposing himself aggrieved, to bring his action, and for the company to meet each as it arose as best it might, etc.

"That at the last annual meeting of stockholders, plaintiff made known a part of his grievances, and a committee at his request was appointed to investigate and report to a future meeting of directors, which has been done for many weeks, and shown the facts to be substantially and in the main as herein set out—and plaintiff says, since the said committees' report, said company has neglected and refused to take any steps to recover for the company the stock so over-issued, the sums due it from its officers or said Shipherd, or the damage by it sustained by their wrongful conduct, though often requested so to do, and has wholly neglected and refused to afford or take any steps toward affording plaintiff and his co-stockholders similarly situated as himself, any relief whatsoever—and plaintiff says every possible effort to get any relief in the premises within said corporation or by its action has been exhausted without effect, and has and will prove utterly unavailing."

A part of the prayer of the petition is addressed to and has reference to the statements, and is predicated upon the statements contained in paragraphs 33 and 34, so that the question arises whether the situation is such as to found any right to any relief whatever in the premises, and if so, whether the situation is such as to found a right to the relief distinctly prayed for.

Now, upon this question some authorities have been submitted, both in the way of adjudicated cases and text writers, some of which were submitted in the argument, and some of which I myself have found. In the first place, upon this subject I call attention to a single paragraph in sec. 312, of Angell & Ames on Corporations—perhaps, to two sentences, the second of which is in point, and I read the first as introductory to the second, and as necessary, perhaps, to its proper apprehension: "And generally," reading now from page 344, "where there has been a waste or misapplication of corporate funds, by the officers or agents of the corporation, to compel

them to account for such waste or mis-application, directors being regarded as trustees of the stockholders, and subject to the obligations and disabilities incidental to that relation.'' This much by way of preface.

''But as a court of equity never permits a wrong to go unredressed merely for the sake of form, if it appears that the directors of a corporation refuse in such case to prosecute, by collusion with those who had made themselves answerable by their negligence or fraud, or if the corporation is still under the control of those who must be defendants in the suit, the stockholders who are the real parties in interest, will be permitted to file a bill in their own names, making the corporation a party defendant.''

Upon the same subject I cite the case of Robinson v. Smith, 3 Paige, chap. 222, reading first from the second syllabus:

''Where there has been a waste or misapplication of the corporate funds by the officers or agents of the institution, a suit to compel them to account for the loss should be in the name of the corporation, unless it appears that the directors of the corporation refuse to prosecute such suit, or the present directors of the company are he parties who have made themselves answerable for the law.'' And then, on page 233, occurs the precise language used in Angell & Ames on Corporations, the language which I read from that text.

To the same effect is the case of Cross et al. v. Sackett, reported in the 16th volume of Howard's Practice, at page 62, reading now the first three branches of the syllabus:

''There is no wrong or fraud, which directors of a joint-stock company, incorporated or otherwise, can commit, which can not be redressed by appropriate and adequate remedies.

''The first mode is when the company in its corporate name, seeks to set aside the fraud, to reclaim abstracted property or prevent a corporate loss.

''The next mode is one when shareholders''—shareholders being in italics —''bring an action for the same object, unitedly, or in the form which the court of chancery permits, of a bill by one or more on behalf of themselves and all others having a common interest. This right exists under various circumstances. It clearly exists, when the directors or agents whose deeds or omissions are impeached, do themselves control the company, and impede the assertion of a right in its own name.''

To the same effect is a case reported in 5 Bradwell, page 133, Hyde Park Gas Company v. Kerber et al., and also the case of Brown v. Van Dyke, 4 Halstead Chan., 795. But by far the most interesting case I have been able to find upon this subject, is reported in 17 New York, being the case of The New York and New Haven Railroad Company v. Robert Schuyler and others, page 592. And there are so many respects in which it is parallel with the case at bar, that I shall read somewhat more at length from this case than I have done from the cases previously cited. The syllabus part of it is in this language:

''Spurious certificates of stock in a railroad corporation, issued by the officer having apparent authority to do so, undistinguishable upon their face from the certificates of genuine stock, and outstanding in the hands of numerous holders as evidences of interests in the property of the corporation, are clouds upon the title of the genuine stockholders which a court of equity will remove.

''The corporation may institute a suit for this purpose, not, it seems, as a trustee of the property and funds under its control, asking advice and aid for its own benefit, but as the representative of the genuine stockholders and in their behalf.

''The false certificates having a common origin and common ground of invalidity, the holders, although they become such under different circumstances and conveyances, and claim different rights, are all properly joined as defendants in an action for the cancellation of the certificates.''

It will be observed that in this case, that is, in the case at bar, the alleged holders of what are claimed to be unauthorized over-issues of stock, are not made parties, they are not impleaded, and no affirmative relief is prayed for as against them. In that request it is differentiated from the case reported in the 17th New York.

This case was heard on demurrer, and is the same case which subsequently found its way into the New York Reports, in the 34th New York—but, in this instance, it was heard upon demurrer.

The facts set forth in the complaint are as follows:

''The plaintiff is a corporation, owning and operating a railroad extending from New Haven to New York. The capital authorized by the charter is limited to $3,000,000, represented by thirty thousand shares of stock, all of the shares except seventy-eight having been issued, and the capital paid in, less about $700 on the seventy-eight shares, several years since. Transfer books of the stock were kept at the city of New York and two other places, where transfers of the stock were made and certificates issued as occasion required. From the organization of the company, in 1846, to the 3rd of July, 1854, Robert Schuyler was the president and transfer agent of the company, having his station and place of business at the office of the company in New York. As early as October, 1853, he commenced a series of fraudulent,

acts, extending over the whole period of time intermediate to that date and the 3rd of July, 1885; during which time, unknown to the plaintiff, he issued and disposed of a large number of certificates of stock of the company, which, on their face, purported to be genuine, were executed and signed in the same manner as genuine certificates, and undistinguishable from them, but which in fact were fraudulent over-issues for his own private purposes. Some of these he issued to a firm of which he was a member; the others were issued to divers other persons.

"In other instances, after making transfers of stock for other parties on the books of the company, he failed to cancel the old certificates which were surrendered for that purpose, but fraudulently re-issued them as genuine certificates of stock owned by himself."

I say there are respects in which this case has a very marked and pronounced parallelism to the case at bar.

"In furtherance of his designs he allowed clerks of his firm to give the firm and himself a false credit on the stockledger of the railroad company," etc.

Comstock, J., in deciding the case said: "This case is somewhat special and extraordinary in its circumstances, and must be determined upon principles of reason and justice, with the aid of such analogies as the law will afford.

"It is well settled that the directors or managers of a corporation are trustees for the holders of its stock. It is on this ground that the shareholders are entitled to relief in equity against an actual or threatened waste or misapplication of its corporate funds. It seems also to be settled that a suit for that purpose must be brought in the name of the corporation, unless it appears that the directors refuse to prosecute, or are themselves the guilty parties answerable for the wrong. If they do thus refuse, or are thus answerable, the shareholders may sue in their own names; but in such a case, the corporation must be made a defendant, either solely or jointly, with the directors sought to be charged."

Passing over much that is not precisely pertinent: "This extraordinary fraud," by which President Schuyler had issued fraudulent and spurious certificates of stock, "could not fail to place the corporation in a situation of extreme difficulty and embarassment. What was to be done with the spurious stock certificates? Were the holders to be recognized? Were they to share in the dividends, and were they entitled to vote at elections? Was the stock of the company practically increased to $5,000,000, when the charter confined it to 3,000,000? If this could not be done, then was the company bound to pay, in damages to each holder of these false instruments, the value which the genuine stock had borne in the market? These were grave questions, about which gentlemen of great eminence in their profession, and the courts also, differed." Skipping a portion of the opinion: "If, then, a new class of individuals should come forward claiming the same rights, and presenting, as the evidence thereof, instruments of the same kind in all respects, bearing on their face all the appearances of genuineness and authority, but in fact unauthorized and spurious, what would be the rights and duties of the legal owner in that exigency? Upon the settled principles of equity, it would be his right and his duty to call the false claimants into court, in order to remove the cloud upon the equitable interests of those whom he represented."

"It is true," passing over a portion of the opinion, and coming now to this— "it is true, we held in the case already mentioned, that the company could successfully defend an action brought against it for refusing to recognize one of these certificates; but the defense rested, as it must if actions were to be brought upon every other certificate, upon the extrinsic facts to be proved. Conceding, even, that every one of these claims may be defended, at whatever distance of time and under whatever circumstances they may be pressed upon the corporation, this by no means meets the equity of the case. If, as we have held, no just claim against the corporation arises out of these certificates, it is plainly unconscientious and inequitable that they should be kept on foot. Their very existence, outstanding, is unjust, because it must of necessity exercise a most depressing influence upon the real stock of the corporation. We all know how sensitive are values in property of this description; and what conceivable facts could cast a deeper shadow over every genuine shareholder's interest than a spurious issue of $2,000,000 of stock, evidenced by certificates apparently valid, and under which every holder boldly and confidently asserted his claim? The fact is not alleged in the complaint, but we can scarcely err in supposing that, on the discovery of these frauds, every share of valid stock must at once have lost nearly one-half of its market value. That depression must continue, in a greater or less degree, while the certificates are allowed to stand. A decision against one of them, in an action founded upon it, is not a determination against any other one, and cannot, while the others are outstanding restore to the genuine stock the value which justly belongs to it. To say that the shareholders must remain in such a condition of insecurity and doubt, and must hold the shares under such a depression, would be to sanction a species of injustice which ought to be prevented. These shares of stock are a description

-of property as much entitled to invoke the protective remedies peculiar to courts of equity as any other."

I have read quite enough, it seems to me, to indicate the drift of that case.

To the same effect is the case reported in the 34th New York.

The case reported in 17 New York, stood upon demurrer. The case in 34 New York stood upon the merits, the question as to whether the court had granted appropriate relief in that case. The court sustains the action of the court below, while saying in the opening sentence of the opinion, on page 44, of the 34 New York: "The practice in this case has been anomalous, and, to some degree. without precedent. There is little danger, however, that any rule will be extracted from its complications likely hereafter to embarrass the courts." Precisely what that may mean I am unable to determine. "Unless, therefore, substantial rights have been violated by the courts of procedure, I am opposed to remitting the case, or any of the parties to it, to another decade of litigation, on any ground of mere irregularity." I will content myself with reading two sentences from this opinion:

"In this exigency, the plaintiffs invoked the equity powers of the court to shelter them from the impending storm, by gathering all these persons, and their claims into a single suit, in order, as they averred, that the duties and obligations of the plaintiffs, and the rights and claims of such persons, might be settled in one suit, and thereby a multiplicity of actions and the delay, expense and litigation attendant thereon be avoided. They called upon the court to investigate the question of the validity of the certificates and transfers of stock held by the defendants."

As I have already said, it will be observed here that the holders of these spurious, or these alleged spurious certificates were impleaded or brought into court, while in the case at bar they are not made parties defendant.

Mr. Russell: May I call your Honor's attention to the fact that in the prayer it is asked that the referee may be instructed to find in regard to the rights of each of them?

The Court: That is right.

"To separate the good from the bad" reading now from the opinion, "and cancel the latter; to stop all actions then pending"—there is but single actions pending relating to this controversy, so far as I know, or involving the validity of any of the certificates—"to stop all action then pending."

From these authorities I think it results, and I think it is practically settled, that it is competent for a court of equity to take cognizance of such a case as is presented by the averments of the petition, and that the court has jurisdic-

tion to grant appropriate relief in the premises. Besides this, there is another distinct ground upon which equity jurisdiction might be founded, and that is the attitude of the defendant company as to these holders of the outstanding certificates, their attitude being that they will stand on the defensive, and meet each claimant as he comes, meet him separately. This would inevitably, in my judgment, tend to a multiplicity of suits, which is in itself a distinct ground of equity jurisdiction, and the attitude of the defendant company would invite that particular situation of affairs, which from the very beginning of our system of jurisprudence has been regarded as a peculiar foundation for the exercise of equity jurisdiction.

We come then next to the plaintiff's motion, that is, that branch of it which prays for an order of reference.

Section 5211, provides, that "When the parties do not consent, the court, or a judge thereof in vacation, may, upon application of a party, or of its or his motion, direct a reference in any case in which the parties are not entitled by the constitution to a trial by jury."

A personal judgment is prayed for as against M. A. Hanna, John J. Shipherd and J. B. Hanna, prayed for both by the plaintiff in his own proper person, and in behalf of those whom he impleads, who are too numerous, that is, their names being too numerous to incorporate in the petition, but being similarly situated with himself. I find however, and perhaps it is too well understood and familiar to need citation or to need reading from books, that in the 27 Ohio St., at page 47, and again in the 28 Ohio St., page 66, our Supreme Court has held, that where the prime relief prayed for is of an equitable nature, that the mere fact that incidentally thereto a personal judgment is prayed for, will not operate to oust jurisdiction.

But it is objected by brief of counsel for the defendant company, that it will be well-nigh impossible to ascertain who are the present holders of such shares of the company's stock as are claimed to be over-issues; that shares of stock pass from hand to hand in the course of trade and business, and that it will be impracticable to undertake to trace them into the hands of their present holders. This is undoubtedly true, and presents a grave difficulty in the way of a thorough and satisfactory investigation of the subject. But the fact that the inquiry will have to be made under circumstances of difficulty, is no substantial reason why no inquiry at all shall be made. Besides this, one of the prime reasons for ordering a reference under ordinary conditions is because the machinery of a court of equity is not adapted to the hearing of controversies presenting intricate questions of book-keep-

ing, or extending into multifarious details, while the less formal procedure before a referee will afford the largest possible scope of inquiry. I am, therefore, disposed to think that the motion in this respect should be granted.

This brings us to the other prayer of plaintiff's motion, to-wit, the appointment of a receiver or receivers.

Section 5587, of the Code provides:

"In the cases provided in this title, and by special statutes"—"a receiver may be appointed by the Supreme Court, or a judge thereof, the circuit court or a judge thereof in his circuit, the common pleas or a judge thereof, in his circuit, or the probate court, in causes pending in such courts respectively, in the following cases," (reading the entire sub division), "in the cases provided in this title, and by special statutes, when a corporation has been dissolved, or is insolvent, or in imminent danger of insolvency, or has forfeited its corporate rights."

It is urged in the first place, and insisted by the defendant company, that the primary and only practical relief prayed for in the petition is a dissolution of the corporation; that that relief can not in any event be granted, and that, therefore, a receivership being only ancillary or incidental principle to the relief demanded, the receivership itself can not be granted.

The legislature by sec. 5651 and succeeding sections has provided a specific manner or mode by which corporations may be dissolved; that that is exclusive, and that the court in the exercise of its general control and power of corporations has no jurisdiction to order a dissolution of the corporation at the suit of any less number than that contemplated by the sections named or in any other manner different from that contemplated by the statute.

On this subject is cited, first, High on Receivers secs. 288 and 289. "It is observed at the outset that the general jurisdiction of equity over corporate bodies does not extend to the power of dissolving the corporation or of winding up its affairs, etc., in the absence of express statutory authority: Wherever statutory authority exists, it is against the theory of the exercise of the general power of a court of equity to dissolve a corporation."

Now, in the absence of any statutory power conferring the right, this text writer says it does not exist. By a much stronger reason, if the legislature has exercised, or rather, if the legislature has prescribed a method by which a dissolution of a corporation may be effected, a very strong presumption results, that it was the intent of the legislature that such method by which a dissolution of a corporation may be effected, a very strong presumption results, that it was the intent of the legislature that such

method should be exclusive of the common law, or rather of any method that the court might exercise in the exercise of its general powers over corporations.

"And courts of equity will not"—I am reading from the same section,—"ordinarily, by virtue of their general equitable jurisdiction, or of their visitatorial powers over corporate bodies, sequestrate the effects of the corporation, or take the management of its affairs from the hands of its own officers and entrust it to the control of a receiver of the court, upon the application either of creditors. or shareholders. And while equity may properly compel officers of corporations, to account for any breach of trust in their official capacity, yet in the absence of statutes extending its jurisdiction, it will usually decline to assume control over the management of the affairs of a corporation, upon a bill filed by a stockholder alleging fraud, mismanagement and collusion on the part of the corporate authorities, since such interference would necessarily result in the dissolution of the corporation, and the court would thus accomplish indirectly what it has no power to do directly. The remedial power exercised by courts of equity in such cases, extends no further than the granting of an injunction against any special misconduct on the part of the corporate officers, and although the facts shown may be sufficient foundation for such an injunction, the court will not enlarge its jurisdiction by taking the affairs of the corporation out of the management of its own officers, and placing them in the hands of a receiver."

Reading now, sec. 289: "Where the jurisdiction of courts of equity has been extended by legislation to the appointment of receivers over incorporated companies, the power thus conferred is treated by the courts as a delegated authority, the exercise of which requires the most careful consideration. The effect of appointing a receiver being to take the property of the corporation out of the control of its own officers, to whom it has been entrusted by its stockholders, the courts proceed with extreme caution in the exercise of so summary a power. And in construing such statutes, they are inclined to give them a strict construction, and require the prescribed method of obtaining jurisdiction of the person and the subject-matter to be strictly followed."

To the same effect is sec. 6842, of the 5th volume of Thompson on Corporations; also, 2 Cook on Stock and Stockholders, sec. 746, and a very interesting case in our own Circuit Court Reports, 2nd vol., p. 518. I read now from the 7th, 8th and 9th branches of the syllabus:

"The appointment of a receiver is. merely a provisional remedy, ancillary and auxiliary to the main action, and.

can only be made in a action brought to obtain some other equitable relief which the court has the right to grant, and where it appears to be necessary to make such appointment in order to preserve the property during the litigation, so that the relief awarded by the final judgment if any, may be effective."

I think it is quite sufficient to have read that seventh branch of this syllabus. A very interesting discussion of the subject is found on page 526, and also on page 527, where the court calls attention to the fact or insists that it is the right of a court to appoint a receiver, even though there could be no dissolution of the corporation, and calls attention to the fact that in two cases that have gone to the Supreme Court of our state, Railroad Company against Sloan, reported in 31 Ohio St., p. 1, and in Jewett v. Railway Company, 37 Ohio St., p. 649, the Supreme Court was in no way disposed, in the opinions reported in those cases, to criticize the action of the lower court in the appointment of a receiver, so far as the question of the power of the court to make the appointment is concerned. The method of appointment is challenged, criticized, and in one case reversed upon that ground.

It would appear from these authorities, and I am convinced that a court of equity in the exercise of its general power over corporations has no power to decree a dissolution of the corporation at the suit of a single stockholder or a number of stock-holders, any number less than that contemplated by the Revised Statutes of the state, or in any other manner than that contemplated by the statutes.

It would follow, therefore, that if a dissolution of the corporation is the only remedy prayed for, the motion for the appointment of a receiver should be granted.

But the petition prays that an account be taken as to the amount of the outstanding certificates of the defendant company, and of the shares of the Cable Company, and as to the persons by whom they are held, and whether or not they were validly issued, and whether they are now legally held by their holders; also prays for an accounting as to the assets and liabilities of the company, avers that many persons who are entitled to shares of stock are unable to get them because of the fact that all of the stock has been issued, that is, all of the stock which the corporation is authorized to issue is already issued; that demand has been made, and a refusal to issue stock to certain holders,—Cable Company stock,—who are justly entitled to receive it; prays also, that an accounting be taken as to all the owners of The Cleveland City Railway Company stock represented by certificates of stock of The Cleveland City Cable Company un-

exchanged, as to the amounts they are severally entitled to receive from the defendant company in regard to dividends heretofore declared and paid by the defendant railroad company, with respect to its stock, as to the owners and holders thereof, but never yet issued to said owners; in respect to such unexchanged stock; and for such other and further relief as the court shall deem just in the premises.

Of course, there is no distinct prayer for the cancellation of the spurious stock, nor are the holders of such stock made parties to this action directly.

I am, therefore, disposed to think that the objection that the only practical relief that is sought is the dissolution of the corporation, is not well taken.

In approaching the consideration of the facts submitted upon this motion, I desire first to call attention to the attitude of our Supreme Court upon the subject of receiverships, and I call attention to the case of Railroad v. Sloan, and to the language of White, J., who rendered the opinion:

"A provisional receivership, is, in effect, an injunction, and something more stringent still. It is to be granted with great caution, and only in a case of pressing apparent necessity. The appointment of a receiver is an equitable remedy, and bears a similar relation to courts of equity that proceedings in attachments bear to courts of law. Hence, the appointment of a receiver has been said to be an equitable execution." Referring now to the language of Judge White: "It is to be granted," to-wit, a receivership, "with great caution, and only in a case of pressing apparent necessity." That is, the necessity may not be real, but it must be pressing and apparent.

Section 5587, provides, that when a corporation has been dissolved, or is insolvent, or in imminent danger of insolvency, a receiver may be appointed.

This remits us to the questions: First, is the defendant company now insolvent? Secondly, if not an insolvent company, is it in imminent danger of insolvency?

I had thought that it might be advisable to state the circumstances attending the consolidation, somewhat at length, but in view of the length of time that I have already taken in the reading of authorities, I shall have to dispense with this summary, condensing my statement into a very few primary facts.

On the 11th day of May, 1893, the directors of the Woodland Avenue & West Side Street Railroad Company, and the directors of the Cleveland City Cable Company, entered into an agreement of consolidation. The situation of the two companies at that time was this: The Cable Company had outstanding, two millions of mortgage bonds, one million

of preferred stock it had issued, three millions of common stock, and had a floating debt the precise amount of which I am not able to determine, but which was approximately $305,000.00. The Woodland Avenue & West Side Street Railroad Company was practically free from debt. This was the situation. In the agreement of consolidation it was provided that the two millions of mortgage debt should be assumed by the consolidated company; that the company should be capitalized at eight millions; that to the shareholders of the Cable Company $1,825,000.00 of stock should be exchanged for the capital stock, preferred and common, of the Cable Company, and $5,175,000.00 of stock of the new company, exchanged for the stock of The Woodland Avenue & West Side Street Railroad Company. I say on the 11th day of May, that contract was entered into. The difficulties arose out of the adjustment—perhaps, I ought to say, that in the distribution of stock to the holders of Cable stock, the distribution of stock of the new company to the holders of stock of the Cable Company, preferred stock was to be treated as of the par value, while the common stock was to be treated as at $20.00 a share, making the sum total $600,000.00, which would represent common stock. There was a surplus, as will be observed, of $225,000.00 which was not to be directly distributed. Upon the consummation of the consolidation a blanket certificate of the entire number of shares of stock which would properly be due to the stockholders·of the Cable Company, —a certificate was made out to Mr. Shipherd and Mr. Robison.

They thereupon endorsed it and delivered it back to the consolidated company. And all of the difficulties that have since arisen, have arisen out of the fact that it became necessary, or was contemplated by the contract, between May 11th, and the 1st of June, that the floating indebtedness of $300,000.00 of the Cable Company should be taken care of and provided for, and out of that situation all of the subsequent troubles and difficulties arose.

Now the first question that is presented is, was the issuance of this blanket certificate to Mr. Robison and Mr. Shipherd, a compliance with the law, or was it a compliance with the terms of the consolidation—the terms of the contract of consolidation. If it was, then the holders of the Cable stock who signed the agreement of consolidation who did not get certificates of the new company, would not be entitled to shares of defendant's stock, or have any claim for damages against the company for the value of such stock. If it was not, then such claim would exist. It would exist unless Mr. Shipherd was the agent of the Cable shareholders in receiving the certificates delivered to him; if he was such agent, then, of course, delivery to him was delivery to them. To determine this question, reference must be had to the original agreement, Exhibit "A," as stated in plaintiff's petition, which is found on page 26, of plaintiff's petition and which I will read as pertaining to this question:

"The undersigned stockholders of The Cleveland City Cable Railway Company hereby appoint and irrevocably designate Frank DeH. Robison and John J. Shipherd as their agents and proxies to carry out this agreement and perfect said consolidation, and they are hereby authorized to attend any and all stockholders' meetings of The Cleveland City Cable Railway Company, called for the purpose of carrying out the terms of this agreement, and to vote all the stock standing in the name of each of the undersigned, in such manner as they shall find necessary to carry out and ratify all of the purposes of this agreement, and each of the undersigned stockholders in said company hereby agrees to deliver to said two persons, or their chairman at such time as they may designate, all of the stock held by him, to be exchanged for stock of the consolidated company in proportion to the respective holdings of each as each shall be entitled to receive the same."

In the articles of consolidation, sec. 2, of art. 7, provides:

"Said shares of capital stock shall be distributed as follows:

"1st. To the said The Woodland Avenue & West Side Street Railroad Company, party of the first part, fifty-one thousand seven hundred and fifty (51,750) shares, to be distributed by said company among its stockholders as they are respectively entitled to receive the same.

"2nd. To The Cleveland City Cable Railway Company, party of the second part, eighteen thousand two hundred and fifty (18,250) shares to be disposed of by said company, so far as necessary, to liquidate its floating indebtedness, and the remainder to be distributed among the holders of the common and preferred stock of said company in proportion to the present relative value of such preferred and common stock."

It will be observed that both the original contract and the articles of consolidation look to the distribution of the shares of the new company to the stockholders to each in proportion to his holdings of the stock of the constituent company. Preliminary, however, to the construction of the original agreement, the articles of consolidation and the application of the statutes thereto, the question of the status of the constituent companies at the instant the consolidation took effect, becomes necessary to determine. Plaintiff contends· that the

constituent companies were instantly emerged into the consolidated company, and that they were extinguished thereby.

Section 3381, provides for the proceedings that shall be had to perfect the consolidation; first, the execution of the agreement; submission to the stockholders, and upon ratification, filing of the certificate, etc.; the effect of the agreement to consolidate." "When the agreement is made and perfected, as provided in the preceding section, and the same, or a copy thereof, filed with the secretary of state, the several companies, parties thereto, shall be deemed and taken to be one company, possessing within this state all the rights, privileges and franchises, and subject to all the restrictions, disabilities, and duties, of a railroad company.' '

Then sec. 3384: "Upon the election of the first board of directors of the company created by the agreement of consolidation, all and singular the rights, privileges, and franchises of each of the companies to the agreement, and all the property, real, personal, and mixed, and debts due on account of subscriptions of stock, or other things in action, shall be deemed to be transferred to and vested in such new company." Title to real estate shall also vest. But the statute provides that the rights of creditors and the liens of creditors shall be preserved, and that the respective companies may be deemed to be in existence to preserve the same.

"Deemed" in this connection might be defined as "regarded as." They are regarded as being in existence for the preservation of liens upon its property, upon the property of constituent companies and the rights of creditors.

In this connection the 49 Ohio St., is cited, a single sentence from page 529: "The result is," reading now from the case of Ashley v. Ryan, page 529, of the 49 Ohio St., "The result is that by consolidation, whether between Ohio companies or between an Ohio company and companies of another state, a new company is formed by the extinguishment of the old ones. And it has been so determined in a number of cases."

This is distinctly held in 95 U. S., 319.

The same language substantially is used in 45 Ohio St., page 615: "The observation of Mr. Justice Swayne, in construing this statute in Shields v. Ohio, 95 U. S., 319, that, 'It was a condition precedent to the existence of the new corporation that the old ones should first surrender their vitality and submit to dissolution,' is quite accurate,' says Marshall, J.

Also in the 46 Ohio St., p. 169, similar language is used:

"The old Ohio company has out no certificates of stock whatever; indeed, it has ceased to exist, for, on perfecting the agreement, 'the several corporations shall be deemed and taken to be one corporation.' That one is the *new* one. The old is abolished and its charter extinguished. The new one thus created, stands, in all respects, in the view of the law, as if the old company had never existed."

I think it can be safely said that they are pretty well extinguished, from the language of the Supreme Court, upon the effectuation of the consolidation, except for the single purpose of the preservation of the liens of creditors and their rights.

From these authorities, as well as from the construction of the statute it seems to follow that the corporate existence of the constituent companies ceased upon the consummation of the consolidation. The consolidation became and is a corporation. If the constituent companies remain such, you have three corporations co-existent, coetaneous, one of which owns all the property, franchises, etc., and the others are kept alive by mere fiction of law for the protection of creditors. From this it would result that the constituent companies were extinguished by the consolidation. Agreeably to this idea, then, the original agreement, the articles of consolidation, when construed in connection with the statutes of the state, may be said to provide, that is, the original agreement, that the certificates of stock in the new company—it will be remembered that I called attention to the distribution according to the amount that each held of the stock of the constituent companies—the distribution of the stock of the new company should be made; it was distributed in its character.

It may be held then, it should be held, I think, that the stock of the new company should properly be delivered to the stockholders of the constituent company or to their authorized agents, and that upon the surrender of the old certificates, and not to the officers of the constituent company as such. For if the constituent companies had ceased, then surely their officers would not survive.

It would result from this, that the issue of new certificates to Shipherd without the surrender of the old certificates was unauthorized and over-issued, unless Shipherd was the agent of the parties, in which event delivery to him would be a delivery to them. Assuming now, that such relation of agency did not exist, such unsurrendered Cable stock still outstanding, would constitute an obligation of the defendant company, either to issue stock to that amount, or to compensate its holders for its value in money.

Recurring now to the main question, what are the assets of the defendant company shown to be by the evidence, and what its liabilities? But, perhaps, before I go to this, it is necessary to fix

precisely in our minds exactly what is meant or implied by the word "solvency" or "insolvency." Webster defines it,—limiting the definition now to the legal definition: "The condition of one who is unable to pay his debts as they fall due in the usual course of business." That is under sub-division (a). Now, under sub-division (b), it is defined: "Insufficiency to discharge all debts of the owner, as the insolvency of an estate."

It is not contended, or at least there is no evidence, in my judgment, tending to show that the defendant company is unable, or has been unable to pay its running expenses or current interest account, so that the first branch of the definition can have no determining force or application here. The contention of plaintiff respects the second branch of the definition, namely, insufficiency of the assets of the company to the payment of its debts, or, if the assets are not actually less than the liabilities, plaintiff contends that the defendant company is at least in imminent danger of insolvency, if not actually insolvent at this time. Not, as I understand, by reason of any present mismanagement or misappropriation, and in that respect this case is unique,—not because of any present mismanagement or misapplication of its funds, or diversion of its stock, but in danger of immediate insolvency by reason of the wear and tear of the running stock, shortening of the terms of its franchises, resulting diminution in its values, etc.

What, then, according to the proof, are the assets of the company, and what their value? But little of direct evidence has been submitted by either side on this question—little of direct evidence. But there are many facts, some of which are undisputed, from which their approximate value may reasonably be inferred. The company was capitalized at eight millions. Much of this was watered, says the plaintiff. He, however, can not be heard at this time in this objection, for he himself participated in and expected to profit by, and to some extent perhaps did profit by its capitalization at eight millions. However, I am disposed to think that little reliance can be placed upon the capitalization of the company as fixing the value of its assets. Another, and a much more reliable criterion, would be the value of the company's stock in the market. The value of a company's corporate stock in the market is the net estimate of the business world upon the value of the assets and the profit-earning capacity of the company. I am well aware that the real value of the assets of a corporation is not the only standard, nor always the principal standard by which the value of its stock is fixed by the commercial world. Profits may be abnormally large and real

assets very small, yet the stock may still sell readily at par or at a premium. But this is exceptional, due to conditions extraordinary and unusual, and such a condition can not long survive the temporary circumstance, by monopoly, by patent, or otherwise, to which it owes its origin. By the inexorable laws of trade, the stock of a company will sooner or later adjust itself to its legitimate level practically. But, under ordinary conditions, it may be safely assumed that the value of the stock of a company can not long remain, or permanently remain much above the real or estimated value of its assets. Tried by this test, how stands the problem?

The company's stock is selling at $59.00 to $60.00 a share, according to the evidence,—in round numbers, say $60.00. We have 80,000 shares multiplied by $60.00, giving a total of $4,800,000. Taking the $8,000,000 at which the company was capitalized, the highest estimate, the speculative, and I might say the actual value of the assets, franchises, etc., of the company would be expressed by some middle term, exactly what, is beyond whatever genius I may possess for mathematics, accurately to determine. The directors of the company file an affidavit in which they aver that the company is abundantly solvent. This, however, rests in judgment and opinion only, and is therefore lacking in such substantial basis as primary facts afford for the ascertainment of property values. But while this is true, it is also true that the estimate which men of business and experience place upon business and property values, is always entitled to respect and consideration. And especially is this the case in the present instance, where the directors and their immediate families are shown to hold and own about one-half of all the stock of the defendant company. Men may hold opinions lightly, and upon slight and unreliable evidence. But business men are little apt to persevere in opinions perversely wrong and unsupported by the facts in cases where their personal interests are involved, and where continuance and obstinacy in error must inevitably involve both them and their families in ruin and disaster. Whatever else may be said, it can be safely said that the directors have, in their affidavits, given their honest opinions as to the status of the company's affairs as to its assets. And I repeat that such an opinion, fairly given, must be, and is entitled to receive fair consideration.

Again, Mr. Emery, a stockholder, and a member of the executive committee of the defendant company, files an affidavit in which he states that the assets exceed in value the liabilities to the extent of four and a half millions. Mr. Otis makes affidavit substantially to the same effect. Mr. J. B. Hanna also makes

an affidavit that the stock is worth $59.00 or $60.00 per share in the market, and that this is fully justified by the assets of the company.

In addition to this, a large number of persons, holding or representing 53,635 shares out of a total of 80,000 of the company's stock, file a written protest against the appointment of a receiver, in which they declare that the defendant company, in their opinion, is in good financial condition and of large earning capacity, and that its resources are abundantly sufficient to respond to any liability which may exist against it. This protest is signed by a large number of the leading business men of this city and its vicinity, and their opinion thus expressed, is, in my judgment, entitled to consideration and respect, having the peculiar sanction of personal interest to base it upon.

While positive data are wanting to determine the exact value of defendant's property, if it were possible, which I think it is not, yet I think from what I have stated above, it may safely be assumed to be somewhere between $4,800,000 and $8,000,000. Looking at the subject from another angle, from another point of view, and assuming that at the time of the consolidation, that the Cable Railway Company was solvent; that is, that its assets were equal in value to its debts, equal to its preferred stock and the net value, net estimated value, to-wit, $20.00 per share of its common stock; that its value was equal to its mortgage bonds, $2,000,000, to its preferred stock, $1,000,000, to its common stock, net value, $600,000, to its floating debt $300,000, its value at the time of the consolidation was $3,900,000.

In the consolidation of the new company, the division of stock in the new company, was in the ratio of, adding now the bonded debt of the Cable Company to the $1,825,000 of the stock which was to go to each shareholder,—the ratio was practically four to five; that is, four parts to the Cable Company—eliminating fractions—four parts to the Cable Company stockholders; and five parts to The Woodland Avenue & West Side Street Railroad Company. On this assumption The Woodland Avenue & West Side Street Railroad Company was worth at that time five million dollars, making the consolidated company worth $8,900,000, so that the capitalization seems to have fallen short somewhat even of the estimated value of the composite properties that make it up.

From the above estimates it would appear that if plaintiff's contention is now well taken that the company is now insolvent, that the Cable Company shareholders in fact contributed nothing at all of net value to the consolidated company, and that all that they did get in the distribution of the stock of the new

[COPYRIGHT, 1898, BY CARL G. JAHN.]

VOL. V.—*22

company was net gain to them and net loss to the stockholders of The Woodland Avenue & West Side Street Railroad Company. If, however, the Cable stock was worth its bonded debt and the amount of its floating debt, and that its preferred stock, instead of being worth par, that is, a million of preferred stock instead of being worth par was worth nothing, and that its common stock instead of being worth $20.00 a share was worth nothing, if the Cable Company was worth the amount of its bonded debt and its floating debt, then the property of the consolidation,—keeping in mind now the ratio of four to five,—The Woodland Avenue Company being free from debt, the Consolidated Company was worth at least five millions of dollars. If the Cable Company was worth the amount of its debts and its preferred stock, leaving out all consideration now of common stock, the Consolidated Company, keeping in mind the ratio already indicated, would be worth six millions of dollars.

The plaintiff in his petition avers that the stock of the Consolidated Company was, at the time of the consolidation, worth $80.00 per share. This would make the value of the property at that time $6,400,000; and the plaintiff not only avers that, but he predicates his prayer for judgment upon the difference to which the property has declined from that as to value at the time of the consolidation. He asks a judgment for the difference.

I say while direct evidence is lacking, these computations have been made upon confessedly correct data.

Now, as to the liabilities of the company. While some of the items are disputed, notably that of $800,000 of over-issues of stock, yet the data are much less inexact than those concerning the assets.

Broadly stated, in the first place, the plaintiff makes affidavit that the company is hopelessly involved and hopelessly insolvent. But that rests in opinion, and is subject to the same infirmity as attached to the opinions stated in the affidavits of the directors. Broadly stated, according to plaintiff's contention, so far as it has any support in the evidence, the statement would stand thus:

Mortgages of the Cable Company, $2,000,000; over-issues of stock resulting from misconduct of Shipherd, $809,500; shortage on defendant's stock misapplied by Shipherd, $173,300; liability of the company to Cable stockholders who did not sign the agreement of consolidation, $130,000; uncancelled power-house mortgage, $30,000; Cable bonds not retired under the contract as shown by Shipherd's letter. $26,000; mortgage on six acres where the Superior street barn stands, $45,000;—making a total of $3,203,800.

Mr. Russell: That should be $4,500.

The Court: I mistook the figures. To this should be added whatever floating debt there may be.—On this subject there is no evidence. Also the amount of obligation to Otis, Hanna and Wade, for which 4,000 shares of stock were placed in indemnity. Deducting from the lowest estimate of the value of defendant company's assets, to-wit, that based on the present value of its stock in the market, $4,800,000, $3,203,800—it should now be changed to the extent of $40,000, we have a net balance of $1,597,000. If the obligation to Otis and others is equal to the face value of the stock pledged—as I say, there is no evidence showing the amount of that obligation—assuming it to be equal to the face value of the stock pledged, to-wit, $480,000, we would still have $1,357,000 net surplus of assets.

Now, as to the million of treasury stock, it was undoubtedly contemplated that that should remain in the treasury. Of this stock 6,000 shares appear to have been issued without any action on the part of the board of directors authorizing it. Of this number of shares 4,277 were re-sold and accounted for according to the testimony of Mr. Emery,—how, or in what manner does not appear. 1,723 shares were entrusted to Mr. Shipherd and wrongfully converted by him. 4,000 shares were placed as indemnity to secure Hanna, Wade and Otis, but for what amount of indebtedness does not appear. There is no evidence tending to show that the proceeds of the sale of the 4,277 shares were misapplied. Mr. Emery swears that the avails of such sale were accounted for and used for the benefit of the company. There is no evidence submitted which would tend to rebut this statement of Mr. Emery. There is no evidence that the obligation with relation to which the 4,000 shares were pledged as indemnity were illegally or fraudulently incurred. Neither side has seen fit to go into the details of these transactions, although the precise facts were within easy reach of both plaintiff and the defendant company.

I am, therefore, disposed to think that the evidence submitted does not establish any fraud with reference to these transactions, even though the issue of these shares was not authorized by the board of directors.

Of course this observation does not apply to the 1,723 shares entrusted to Shipherd and converted by him.

It will be observed that I have stated the over-issue as being $$809,500. This item is, of course, disputed; that is to say, it is not conceded that it constitutes an obligation of any kind upon the company. In the consolidation agreement Mr. Shipherd signed for 20,000, Robison for 10,000, the whole number of shares of the Cable Company being

about 35,000. It does not clearly or satisfactorily appear from the evidence exactly what was done with reference to the 20,000 shares held by Mr. Shipherd.

If he owned them, or was the agent of the owners of these shares, and the fact that he signed for that number would tend to show such ownership or agency, then no liability of the company can possibly be predicated upon them. I say the evidence is not clear as to the precise situation of affairs with respect to those 20,000 shares of stock, either as to the question of ownership or agency. Under the evidence submitted in this hearing any inference with respect to them would necessarily rest upon conjecture rather than upon reliable, positive, reliable proof.

Next as to the 10,000 shares signed for by Mr. Robison. He claims to be the equitable owner of $320,000, and we will assume that he is such. As to this portion of the $809,500, I think that the circumstances are such that his laches in the premises, his close association both with Shipherd and the company, the fact that he was an officer of the company are such as to disentitle him to any relief against the company based upon any misconduct of Shipherd in this behalf. And upon that head, while I have the case before me, I will cite a single paragraph of the syllabus, 5 Bradwell, p. 133: "A suitor must come into a court of equity with clean hands and a stockholder of a corporation, seeking to arraign its ministerial officers for breaches of trust, must himself be free from any participation in such breaches, or the misappropriation of the corporate funds or property."

Besides this, if the facts and circumstances attending the whole transaction of the consolidation were such as to constitute Shipherd the agent of the Cable shareholders generally, and I am disposed to regard that at least as a debatable question there could be no liability of the company predicated upon the alleged over-issue, for in that event the shares of Cable stock outstanding in the hands of Shipherd's principal, would be held in equity to be cancelled and could only be construed into an obligation of the company in the event of their transfer to innocent holders for value.

I have also treated the $173,300 stock entrusted to Shipherd and converted by him, as a liability of the company. This is not in a literal sense a liability. That is to say, it can hardly be said that shares of stock of a corporation are liabilities of the corporation. They are rather certificates of co-ownership of the property and evidence of the right of the holders to participate in the profits of its business. It should also be borne in mind that if the 3,095 shares of over-issue of stock are to be treated as an obligation or liability of the company, it

is at least subject to an off-set of $305,765.88, the floating debt of the Cable Company. Besides this, in the above statement I have not only stated the liabilities of the company in the largest term for which the evidence would afford the slightest warrant, in my judgment, but I have estimated the value of the company's assets at a figure much below what I think the evidence fairly shows to be their real value. Indeed, I think, taking into account the separate properties merged by the consolidation, the estimate of their value, actual and relative value, as the basis of distribution of the new company's stock between the stockholders of the constituent companies; the averment of plaintiff in his petition that the stock at the time of the consolidation was worth $80.00 per share, or $6,400,000, the estimate of its present value by men having peculiar means of knowledge of value of that class of property, in short, in view of all the evidence submitted at the hearing upon that subject, I am of the opinion that five and a half millions would not be an exaggerated statement of the present value of the company's assets. If, from this sum you deduct the admitted liquidated and undisputed liabilities of the company, estimating the liability of the company to be equal to the face value of the 4,000 shares pledged as indemnity, we would, then, have a total—estimating the liability of the company to Wade, Hanna and Otis, as $240,000, we would have assets five and a half millions, the liabilities two million four hundred and seventy-one thousand, leaving a net difference between the company's assets and liabilities to the amount of $3,029,000. However, if this be too optimistic a view, and if the liabilities are as large as claimed by the plaintiff, the situation would stand thus: Assets, $5,500,000; liabilities, $3,471,000, net balance of assets over liabilities of $2,029,000.

It would, therefore, result from the inexorable logic of arithmetic that the defendant company is not now insolvent. But it is alleged that the company is in imminent danger of insolvency. And this presents the second contention of plaintiff.

It should be borne in mind that all the delinquencies complained of as against the officers of the defendant company occurred some time ago, several years ago, in fact. It is not claimed—at least there is no evidence tending to show present mismanagement. Past delinquencies are important to be understood only in so far as they serve to explain the present condition of the company's affairs. With the majority of the present board of directors the stockholders are practically all perfectly satisfied. There is nothing in connection with the present conduct of the company's business

complained of, except their refusal to investigate the actual state of the company's affairs, nothing that would necessarily tend to involve the company in future loss. The contention rather, is, that the management are indisposed to investigate the details of the past losses and irregularities of the officers with a view to their correction and fixing the liability, if any there be, upon the officers of the company who are claimed to have been negligent in the conduct of its affairs. The question then comes, is the situation of the company such as to render it necessary at this time,—is there such necessity, urgent necessity, or, as Judge White puts it, apparent necessity, for the preservation of its property and the protection of its stockholders, to depose the present management of the defendant company, to declare the company insolvent, and put its affairs into the hands of an officer or officers of this court?

Viewed as a practical matter it stands thus:

Nearly all of those interested in its affairs object to such a course. To declare the company insolvent, and to appoint a receiver on the ground of insolvency, would cause an instant depression in the value of every share of its stock, and thus entail an actual loss of a large amount upon the great body of the stockholders who are admittedly without fault in the premises.

To appoint a receiver would not, in my judgment, be of the remotest advantage to a single stockholder of the company or to any one entitled to shares of stock, while to do so on the ground of the insolvency of the company, would operate instant and inevitable injury to every stockholder in the company. Besides, it is in no way apparent how a receiver's management could be made to conduce to the interests of the stockholders. The present management is not found fault with as to the details of the company's business.

The court has no power to decree a dissolution of the corporation in this action. A receivership, in this action, would entail large expense without any compensatory advantage. And how long should a receivership continue? There is nothing in my mind connected with the affairs of the company that would warrant so drastic a remedy.

Applying the test as laid down by Judge Smith, in 7 Circuit Court Reports, page 526, it can not be said to be necessary to appoint a receiver in the case to preserve the property during litigation, so that relief awarded by the judgment in the case may be effected.

The matter next to be considered is the motion of the defendant company for a dissolution of the temporary restraining order heretofore granted by the court.

The restraining order was allowed on October 2, 1897, and was conditioned by the prayer of the plaintiff's petition. The motion prays that the restraining order be dissolved so as to permit defendant company to pay to its stockholders the dividend declared by its board of directors on September 22, 1897, and to transact its business in the usual course. It appears from the evidence, that in October, 1897, out of the earnings of the defendant company, a dividend aggregating $57,000 was declared, and that in January, 1898, another of like amount was also declared; that the gross sum of $114,000 is now lying in the treasury of the company that can not be paid out to the stockholders, because of the restraining order above referred to.

The prayer of plaintiff's petition with respect to the injunction, is as follows:

"Wherefore, plaintiff prays the court here to restrain and enjoin, pending this action, the defendant, The Cleveland City Railway Company, and M. A. Hanna, its president, and J. B. Hanna, its secretary, from paying any dividends, transferring, signing, issuing or delivering any certificates of the stock of said The Cleveland City Railway Company, till the further order of this court be first had."

This motion is insisted by plaintiff on two grounds:

First, because the defendant company is insolvent, and therefore payment of dividends to stockholders would defraud the creditors of the company, and would be an unwarranted diversion of corporate funds, which should be prevented by injunction.

Upon this subject I have already given an opinion.

Second—It is next insisted that the dividends should not be allowed to be paid because of the over-issue of more than $800,000 of stock; that these certificates are out-standing; that they were wrongfully issued; that to pay dividends on them would operate to the injury of the bona fide and legal stockholders of the company; that such payment would be a diversion of the funds of the company into unauthorized channels, and would therefore and thereby deprive the legal shareholders or those who are legally entitled to stock, of their rightful dividends.

This contention, of course, proceeds very largely upon the assumption that in the receipt of the stock by Mr. Shipherd he was not acting as agent of the Cable stockholders. On the other hand, it is contended by the defendant company that the $114,000 is net profits and is lying in the treasury of the company awaiting distribution to its stockholders; that many of them are in need of the money which should be paid them as dividends; that some of the stockholders have hypothecated their stock; that it is the al-most unanimous wish of the stockholders that the dividends should be paid, and that no injury can possibly result to any stockholder of the defendant company by reason of the payment of such dividends, and that to withold payment of the dividends would result in serious inconvenience to the defendant company's stockholders.

Assuming that $800,000 of stock has been illegally issued, and that dividends thereon are paid, what would be the result? $800,000 worth of stock would represent one-tenth of the stock of the company. If these dividends are wrongfully paid, it would result in the wrongful diversion of $11,400 into unauthorized channels, and would constitute a liability on the part of the company to its shareholders in that sum, or a pro rata liability to each stockholder.

In view of the condition of the business and property of the defendant company, I think it would hardly be contended that such a situation is grave enough to warrant the interposition of a court of equity by injunction; much less can it be contended that plaintiff would irreparably suffer by reason of the payment of such dividends. However, in view of what has taken place in the past with reference to the issue of defendant company's stock, I think the restraining order, so far as it relates to the issuing of certificates of stock, should be continued; otherwise, it should be dissolved.

The next matter for consideration arises upon the demurrer to the petition of John J. Shipherd. Much of the petition is occupied in a recital of the irregularities and misconduct of Mr. Shipherd with reference to the conduct of the affairs of the company submitted to his management. But it will be observed that while there are many averments as to him, it is not averred that he is the present owner of any stock which ought to be cancelled, and that the only affirmative relief, aside perhaps from what might possibly be comprehended under the general prayer for relief, that the only practical relief prayed for as against him, is a personal judgment in favor of the plaintiff, Mr. Robison, and in favor of any other holder of unexchanged stock of The Cleveland Cable Railway Company.

I am of the opinion that the only liability which the facts pleaded in the petition would raise as against Shipherd would be a liability to the corporation, and that no personal judgment can be rendered in favor of plaintiff upon such liability. Judgment in favor of a corporation is not prayed for as against Shipherd,—but merely a personal judgment. If the liability of Shipherd is predicated upon the claim that he was the agent in receiving stock of the new company, the agent of the plaintiff and

others, and wrongfully converted it to his own use, this would be a cause of action against him alone, and as to such a cause of action the defendant company would not be either necessary or a proper party.

If, on the other hand, it is claimed, that Shipherd was not the agent of the Cable Company's shareholders, and that he therefore committed a fraud on the company in getting such certificates into his possession, then he would be liable to the company, and not liable directly to its stockholders, as such. And as no judgment is prayed for against him in favor of the defendant company, no relief can be granted as to him upon the petition as it now stands. It is not averred that he is in possession of any stock which should be called in and cancelled, nor am I able to find any averment in the petition upon which any relief as against him and in favor of the defendant company could be predicated upon the petition as it now stands.

The demurrer will therefore have to be sustained.

L. A. Russell, N. A. Norris, Kline, Carr, Tolles & Goff, Counsel for plaintiff.

Squire, Sanders & Dempsey, Webster, Angell & Cook, Counsel for defendant.